O

# United States District Court
# Central District of California

| | |
|---|---|
| MICHAEL WHITE,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>THE SENIOR LEADERS SEVERANCE PAY PLAN OF DANAHER CORPORATION AND ITS AFFILIATED COMPANIES, et al.<br><br>　　　　　　Defendants. | Case No. 2:17-cv-03476-ODW(JCx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [23]** |

## I.　INTRODUCTION

Plaintiff Michael White claims he was improperly denied severance benefits after his employer fired him. White's employer, Danaher Corporation, and The Senior Leaders Severance Pay Plan of Danaher Corporation (collectively "Danaher") move for summary judgment on White's single claim related to Danaher's allegedly improper denial of severance benefits, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B). (Mot., ECF No. 23.) White opposes. (Opp'n, ECF No. 24.) For the reasons below, the Court **GRANTS**

Danaher's Motion.[1]  (ECF No. 23.)

## II. FACTUAL BACKGROUND

Between November 2007, and December 2, 2015, Danaher employed White as the Director of Value Engineering ("Director") at Beckman Coulter, Inc. ("BCI").[2] (Pl.'s Sep. Stat. of Gen Disputes of Mat. Fact ("PSUF") No. 2, ECF No. 24-1.)  BCI manufactures and markets products that simplify, automate and innovate biomedical testing.  During his employment, White was eligible to, and did, participate in The Senior Leader's Severance Pay Plan of Danaher Corporation (the "Plan"), which is an ERISA-governed severance benefit plan, sponsored and administered by Danaher. (PSUF Nos. 49–51.)

### A. The Plan

Danaher funds and administers the Plan.  (PSUF Nos. 50–52.)  The Plan provides severance benefits, among other things, to qualified individuals, subject to certain conditions.  White is a qualified individual.  The Plan reserves sole discretion to interpret its terms and make factual findings to Danaher as the Plan Administrator, or its delegees.  (PSUF No. 54.)  Danaher delegated authority to make final determination on appeals of denied claims under the Plan to the Senior Vice President of Human Resources.  (PSUF No. 53.)  The Senior Vice President of Human Resources during the relevant period was Angela Lalor.  (*See* Declaration of Patricia Kim, Ex. A ("PLAN") 000284–88, ECF Nos. 23-5–23-11.[3])  "[T]he decision as to whether or not an employee is eligible for severance is solely within the Plan Administrator's discretion."  (PSUF No. 55.)  An otherwise eligible employee is not entitled to severance benefits if they are terminated "for cause," as defined by the Plan, and interpreted by the Plan Administrator.  (*See* PSUF No. 56.)

---

[1] After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.
[2] BCI is a subsidiary of Danaher.
[3] The documents attached as Exhibit A to the Declaration of Patricia Kim comprise the administrative record in this ERISA action.

## B. The Primum & Homar Contracts

One of White's responsibilities as Director was to engage consultants to assist in reducing costs incurred by BCI. (PSUF No. 3.) Two contracts were of particular interest in Danaher's decision to fire White—the Primum Analytics ("Primum") contract, and the Homar Product Innovations ("Homar") contract.

In March 2008, White engaged Primum to provide value engineering services as an independent contractor. (PSUF No. 4.) The contract limited payments to $84,000, total, and did not provide for automatic renewal, "unless made in writing and signed on behalf of [BCI]…." (PSUF No. 6.) It also provided that the "[t]erm [could] be extended if mutually acceptable." (*Id.*) Despite these limitations, the Primum contract continued through 2015, without any written extension. (PLAN 000122.) White contends that payments to Primum could not have continued without his supervisor, Scott Spicer's, approval. (PSUF No. 8 (citing PLAN 000131, 134, 163–70).)

In May 2010, White engaged Homar to provide consulting services similar to those provided by Primum. (PSUF No. 9.) Jeff Ho is a partial owner of Homar, and also works for BCI. (PSUF No. 10.) Ho reported directly to White. (*Id.*) The two also played in an amateur band together. (*Id.*) Like the Primum contract, the Homar contract provided a maximum payment amount, and provided that "[n]o additional services shall be performed or compensated for after the expiration or termination of [the] Agreement…, unless made in writing and signed on behalf of [BCI]…." (PSUF Nos. 11–12.) Danaher claims White approved payments to Homar that totaled nearly one million dollars, which was in excess of what the contract allowed for, between 2010 and 2015. (PLAN 00007, 131.) As with Primum, White counters that all payments had to be approved by his managers and therefore they knew that the contract expired, and that payments continued in excess of the initially-agreed-to amount. (PSUF No. 14.) Homar invoiced Danaher for its work. (PLAN 00006, 125,

127, 131, 139.) White contends that, at the time he engaged Homar, invoicing was the approved method for paying independent contractors. (PSUF No. 16.)

**C.     The 2013 Investigation & Contingent Workforce Policy**

In 2013, Danaher investigated White's engagement of Primum and Homar, among other things. (PSUF No. 17.) Danaher concluded that White lacked appropriate contracts with them, and as a result of the investigation Danaher told White that he must coordinate with Human Resources to update the agreements, if he continued to use Primum and Homar's services. (PLAN 00003–4, 7, 135.) White never obtained updated agreements. (PSUF No. 21.) He claims that he submitted requests for review of new contracts to his superiors in August 2014, but that his managers never fulfilled the requests.

In January 2014, Danaher instituted a Contingent Workforce Policy ("CWP"). (*See* PLAN 000028.) The CWP required all independent contractors to have written agreements, and to be engaged for no more than 18 continuous months, followed by a 3-month break in service. (*See id.*; PSUF Nos. 23–28.) On March 20, 2014, Danaher sent an email to White and others discussing how to implement the CWP, and requiring certain actions to bring independent contractors into compliance. (PLAN 000028; PSUF Nos. 23–28.) Part of this rollout also required that independent contractors were paid via purchase order. (PSUF No. 33.) According to the CWP, all new engagements "must comply with this policy [and] existing contingent worker relationships shall be brought into compliance…within nine (9) months of publication," or by September 2014. (PSUF Nos. 22, 24, 28.) The announcement and request for compliance explained that "[u]nderstanding and following company procedures is the responsibility of every associate and part of enhancing our culture of compliance." (PSUF No. 28.)

**D.     White's Failure to Comply, The 2015 Investigation, & Termination**

White initially expressed hesitation as to whether Primum and Homar were independent contractors versus professional service consultants. In response to one of

his inquiries, on June 27, 2014, a Danaher representative advised that they were likely independent contractors, and that, in any event, their existing contracts were expired, and needed to be renewed. (PSUF No. 36.) White responded that he would fill out the appropriate form. (*Id.*) About two weeks later, a representative of Danaher from the legal department followed up with White requesting that he "bring [his] contractors into compliance asap." (PSUF No. 37.) White responded that he would "get the forms filled out by tomorrow." (PSUF No. 38.) However, it was not until August 14, 2014—more than a month later—that White submitted a request for review of the Homar contract. (PSUF No. 39.) Danaher contends that White never submitted a justification for why Homar should be permitted to be engaged as an independent contractor in excess of the 18-month limit. White counters that he submitted draft proposals, but that his superiors never gave "any draft a final approval." (PLAN 0000132.) White did comply with the CWP's requirements with respect to two other independent contractors that he managed. (PSUF No. 40.)

In 2015, Danaher investigated White's failure to comply with the CWP with respect to Primum and Homar a second time.[4] (PSUF No. 41.) During the investigation, White acknowledged that Primum and Homar were not in compliance with the CWP, and claimed that he was "working on it." (PSUF No. 42.) Danaher also determined that White failed to properly escalate the potential conflict of interest because of Ho's part ownership in Homar to his superiors. (PSUF No. 44.) White contends he disclosed the potential conflict to his superiors. (*Id.*) On December 2, 2015, Danaher fired White, and told him that he would not be eligible for severance because he was terminated for cause. (PSUF Nos. 45, 48.)

---

[4] White's counsel disputes this and several of the facts alleged by Danaher, but submits no evidence to the contrary, such as a declaration from his client contradicting the statements attributed to him. Instead, he relies on his objections to the summaries contained in the administrative record, which the Court addresses below in Section IV.B.2.

**E.     White's Claim for Benefits & Appeal**

On December 18, 2015, White submitted a claim for benefits. (PSUF No. 59.) The Benefits Committee reviewed White's claim, and during the course of the Committee's investigation, it asked for additional information. (PSUF No. 60.) The Committee reviewed a summary of White's employment and the facts leading to termination, which was prepared by counsel. Ultimately, the Committee determined that White was terminated for cause, and denied him severance benefits. (PSUF No. 63.) On June 16, 2016, the Committee sent a letter to White explaining its reasons for denying White benefits, citing particular sections of the Plan, and informing White of his right to appeal. (PSUF No. 64.)

White appealed the Committee's ruling on September 7, 2016. (PSUF No. 66.) He claimed he was entitled to severance benefits for two additional reasons, which he raised for the first time on appeal. First, he was entitled to severance because his position "was eliminated as part of a planned restructuring of the department." (PSUF No. 66.) And, second, because he was a well-intentioned, but poor performer, under Plan Section II.A.4. (*Id.*)

Patricia Kim, Vice President & Chief Counsel, Labor & Employment, assisted Lalor in reviewing White's appeal. (PLAN 000265–71.) Lalor reviewed a detailed report that summarized the allegations raised White's appeal, and provided supplemental information and documents gathered in response to White's allegations. (PLAN 000177–84.) Danaher ultimately informed White that it would deny his appeal because BCI's "determination that [White's] employment termination was for 'cause' was consistent with" the Plan's definition of cause, and White was therefore ineligible for severance. (PLAN 000172–76.)

With respect to White's two additional allegations raised for the first time on appeal, Danaher considered the evidence presented by White, but ultimately concluded that White's position was not eliminated, and that he did not qualify as a

well-intentioned, but poor performer. (*Id.*) White then sued Danaher, claiming it abused its discretion in denying him severance benefits.

### III. STANDARD OF REVIEW

Typically, summary judgment is appropriate where there is no "genuine dispute of material fact." Fed. R. Civ. P. 56(c). "In ERISA actions, however, where the plaintiff is challenging the plan administrator's denial of benefits…'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" *Farhat v. Hartford Life & Acc. Ins. Co.*, 439 F. Supp. 2d 957, 966 (N.D. Cal. 2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)).

As discussed further below, this maxim is not as simple in practice as one might think. First, the Court addresses whether Danaher's actions should be reviewed for an abuse of discretion. Second, the Court evaluates whether, in assessing a conflict of interest, it: 1) may consider facts outside of the administrative record; and 2) must view those facts in the light most favorable to the non-moving party.

### A. Danaher Acted Pursuant To A Grant of Discretionary Authority

While the parties initially agreed that the Court should evaluate Danaher's denial of benefits for an abuse of discretion, White now contends the Court should review the denial de novo.[5] (Joint Report, ECF No. 15; Opp'n 7–9.) Where an ERISA plan gives a plan administrator discretionary authority to interpret plan terms, the Court reviews the plan administrator's decision for abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 928–29 (9th Cir. 2012). Here, "The Plan Administrator or its delegate shall have the discretionary authority to determine eligibility for Plan benefits and to construe terms of the Plan, including the making of factual determinations."

---

[5] White explains that at the time he participated in the Rule 26 conference, he did not have the benefit of Danaher's initial disclosures, and thus did not have any basis to contest the standard of review. (Opp'n 7.)

(PLAN 000315.) This delegation of discretionary authority could not be clearer. However, the Court's inquiry does not end here.

White contends that Danaher did not properly exercise any discretion because Patricia Kim, Danaher's VP & Chief Counsel, Labor & Employment, decided his appeal, instead of the Senior Vice President Human Resources, Lalor. (Opp'n 6.) The Plan defines the "Plan Administrator" as the Company, and then delegates "the authority to make final determinations on appeals of denied claims under this Plan to the Senior Vice President of Human Resources." (PLAN 000315.) "The Plan Administrator may delegate to other persons responsibilities for performing certain of the duties of the Plan Administrator under the terms of the Plan…[and] shall be entitled to rely upon the information and advice furnished by such persons…." (*Id.*)

The thrust of White's argument is that Danaher did not exercise discretion because Kim reviewed evidence, prepared a draft letter, and presented it for Lalor's review and approval. (Opp'n 6.) He cites several emails, which he contends show that Kim did most of the legwork in investigating the appeal and preparing a recommendation. (PLAN 000256, 267–68.) Even if the Court accepts White's interpretation of the emails, this course of action is consistent with the Plan's grant of authority to the Plan Administrator to "delegate to other persons responsibilities for performing certain of the duties of the Plan Administrator…." (PLAN 000315.) Moreover, on February 9, 2017, Lalor reviewed the draft letter prepared by Kim, exercised her discretion, and approved it, subject to a formatting change. (PLAN 000268.) These facts support review under the abuse of discretion standard. *See Glenn*, 554 U.S. at 111.

*Nelson v. EG&G Energy Measurements Group, Inc.* does not change the Court's analysis. 37 F.3d 1384 (9th Cir. 1994). There, the Ninth Circuit held a plan administrator's actions deserved de novo review, despite a grant of discretionary authority from the plan, where the body designated as the plan administrator did not take any action. *Id.* at 1388 ("The record reveals that no action was ever taken by the

Administrative Committee interpreting the valuation date as set forth in section 2.44 of the Plan or interpreting its application to the particular circumstances of these retiring employees."). To the contrary, Lalor reviewed the information in the letter prepared by Kim, which addressed the application of the Plan's definition of termination "for cause," and applied it to the facts of White's appeal by approving it. (PLAN 000268.) That Lalor delegated much of the work that led to the drafting of the letter to Kim, was within her power under the terms of the Plan. *See Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F. 2d 1279, 1283–84 (9th Cir. 1990). Accordingly, the Court applies the abuse of discretion standard of review, subject to the discussion below.

**B. Conflict of Interest Standard of Review**

Here, Danaher administers and funds the Plan. (PLAN 000315, 320.) Because of this, it operates under what has been termed a "structural conflict of interest" and the Court's review must be "tempered by skepticism commensurate with the Plan administrator's conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 959 (9th Cir. 2006). This requires an abuse of discretion review "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Id.* at 967. The Supreme Court has indicated that an ERISA fiduciary's structural conflict of interest is but one factor in considering whether the fiduciary abused its discretion. *See Glenn*, 554 U.S. at 116–17. The conflict of interest may be an important factor if "circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id.* at 117. Conversely, the importance of a conflict of interest may be low if there is no "evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at 968. Though "[t]he district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest[,] the

decision on the merits . . . must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* at 970. When evaluating extrinsic evidence regarding a conflict of interest, however, the Court must employ traditional summary judgment principles. *Stephan*, 697 F.3d at 930 (quoting *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009)) ("As to issues regarding the nature and impact of a conflict of interest, summary judgment may only be granted if after 'viewing the evidence in the light most favorable to the non-moving party, there are [no] genuine issues of material fact.'").

## IV. DISCUSSION

The Court first evaluates how much weight to afford the structural conflict of interest present because Danaher administers and funds the Plan. Then, it addresses the reasonableness of Danaher's decision to deny severance benefits.

**A. Conflict of Interest Analysis**

White claims that Danaher "did nothing to affirmatively demonstrate its impartiality" and acted without reason. (Opp'n 8.) He also alleges that Danaher "discounted the statements of BCI employees without explanation." (Opp'n 8, 19.) He does not cite to any evidence supporting his theories.

The Plan requires fiduciaries to act "prudently and in the interest of Plan participants and fiduciaries." (PLAN 000068.) On June 7, 2016, Kim reached out to Rick King and Frank McFaden, both of whom were on the Benefits Committee, and told them that the Benefits Committee needed to review White's claim for severance benefits. (PLAN 000185.) She also agreed to provide them "a summary of the matter, facts surrounding the termination of White for cause, etc." (*Id.*) On June 20, 2016, after having notified White that the Benefits Committee required additional time to evaluate his claim, the Benefits Committee sent White a letter explaining the basis for denying White's claim, and setting forth the specific Plan provisions it relied on, White's violation of some of those provisions, and White's right to appeal the decision. (PLAN 000189–91.) After receiving White's appeal, on September 7,

2016, Lalor asked Kim whether she could handle it. (PLAN 000246.) Kim explained that Lalor was the "final step in the mandatory claims procedure under the Severance Pay Plan…[and agreed to] assist [Lalor] in the necessary level of review, etc." (*Id.*) On February 9, 2017, Lalor sent White a five-page letter explaining Danaher's basis for denying his appeal. (PLAN 000172–76.) In it, Lalor addresses the additional evidence White submitted on appeal and explains her reasons for discrediting it. (PLAN 000172–76, 258–60, 285–86, 288.) Neither White's allegations nor the record support a finding of malice, self-dealing, or "parsimonious claims-granting history." *Abatie*, 458 F.3d at 968–69. There are no material and genuine disputes of fact relating to the claims process employed by Danaher. Accordingly, the Court does not apply any significant increased scrutiny due to this relatively commonplace structural conflict of interest.

**B.     Danaher Did Not Abuse its Discretion**

White presents two procedural challenges to Danaher's Motion, which the Court must first address: 1) he claims Danaher has the burden of showing that it fired him for cause; and 2) he claims the "Executive Summary" and "Summary Review" Danaher relied on have no evidentiary value and cannot be used to support Danaher's denial. (Opp'n 9–10, 13.)

*1.     Burden of Proof*

White claims it is Danaher's burden to prove, by a preponderance of the evidence, that it fired him "for cause" because it is an exclusion under the Plan. (Opp'n 9 (citing *Cohen v. Metro. Life Ins. Co.*, 485 F. Supp. 2d 339, 349 (S.D.N.Y. 2007).) He cites several out-of-Circuit opinions that address an insurer's burden to prove an exclusion under an insurance policy addressing health benefits. *Cohen*, 485 F. Supp. 2d at 349 (addressing pre-existing condition exclusion); *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002) (same); *Critchlow v. First UNUM Life Ins. Co. of AM.*, 378 F.3d 246, 257 (2d Cir. 2004) (addressing self-inflicted injury exclusion). Without citing any authority, Danaher argues that the Court should not

apply these insurance-based principles to this case, which concerns severance benefits. (Reply 5–6.) The Court could not find any authority applying the burden White seeks to impose on Danaher in the severance benefits context. However, even if the burden rests on Danaher, as described below, its burden has been met. Accordingly, the Court declines to decide whether Danaher bears the burden of proof, and finds that the evidence it relied on to find that White was terminated for cause suffices, even if the burden applies.

### 2. *Evidentiary Issues*

White contends that Danaher's reliance on factual summaries in denying his claim was improper. Danaher responds that the factual summaries it relied on were prepared by counsel as part of its investigation of White's claim and subsequent appeal. (Declaration of Joe Bernasky ¶ 2, ECF No. 25-1.) White cites an unpublished ERISA case from the Sixth Circuit, where the court declined to rely on a letter describing an unproduced physician's medical report because it was hearsay. *Hunter v. Life Ins. Co. of N. Am.*, 437 F. App'x 372, 373 n.1 (6th Cir. 2011). This case is not controlling, and does not persuade the Court. The Court reviews the decision of the plan administrator for an abuse of discretion, and therefore must review the materials before the plan administrator at the time of its decision. *Cf. Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999) (discussing rationale for only reviewing materials in the administrative record when reviewing plan administrator's decision for abuse of discretion). To the extent the summaries are contradicted by other evidence in the record, the Court will factor that into its analysis of whether Danaher abused its discretion, but the Court refuses to discount the summaries entirely, and **OVERRULES** White's objection.

On the other hand, Danaher objects to the introduction of a statement from Ho, Abdallah, and a printout of Natasha Barr's LinkedIn profile[6], which White submitted with his Opposition. (Defs. Obj. to Evid., ECF No. 27.) Danaher argues that, under

---

[6] Barr used to work in BCI's Human Resources department.

the abuse-of-discretion standard, the Court should not consider evidence outside of the administrative record. *See Abatie*, 458 F.3d at 970 (noting general rule that the Court may not consider extrinsic evidence when reviewing plan administrator's actions for an abuse of discretion, but also noting that extrinsic evidence may be admissible to challenge structural conflicts of interest). The two type-written statements of Ho and Abdallah are dated May 7, and 8, 2018, respectively, and were not made under penalty of perjury. (PSUF Exs. 1, 2, ECF Nos. 24-3, 24-4.) Because neither of the unsworn statements nor the LinkedIn printout address procedural "irregularities [that] have prevented full development of the administrative record," the Court does not find it appropriate to consider this extrinsic evidence. *Abatie*, 458 F.3d at 973. Accordingly, the Court **SUSTAINS** Danaher's objections. (Defs. Obj. to Evid., ECF No. 27.)

*3. Danaher Reasonably Exercised Its Discretion & Did Not Abuse It*

The Plan grants Danaher the sole discretion to interpret its terms, apply them, and make factual findings. (PLAN 000315.) Most importantly, "[a]n otherwise eligible employee shall not be eligible for severance benefits under the Plan if the Plan Administrator determines, *in its sole discretion*, that…the employee…is discharged for cause, *as determined by the employee's Employer in its sole discretion*…." (PLAN 000308 (emphasis added).) The Plan defines "cause" as:

> (i) the employee's dishonesty, fraud, misappropriation, embezzlement, willful misconduct or gross negligence with respect to the Employer, or any other action in willful disregard of the interests of the Employer; (ii) the employee's conviction of, or pleading guilty or no contest to (1) a felony, (2) any misdemeanor (other than a traffic violation), or (3) any other crime or activity that would impair the employee's ability to perform duties or impair the business reputation of the Employer; (iii) the employee's willful failure or refusal to satisfactorily perform any duties assigned to the employee; (iv) *the employee's failure or refusal to comply with Company standards, policies or procedures, including without limitation the Company's Standards of Conduct as amended from time to time*; (v) the

13

> employee's violation of any restrictive covenant agreement with an Employer; (vi) the employee's engaging in any activity that is in conflict with the business purposes of the Employer, as determined in the Employer's sole discretion, or (vii) a material misrepresentation or a breach of any of the employee's representations, obligations or agreements under this Agreement);

(*Id.* (emphasis added).) Danaher contends it terminated White for cause because he: 1) failed to obtain updated contracts with Primum and Homar as directed in 2013, and also mandated under the CWP in 2014; 2) did not follow BCI's standard practices for making payments to Primum and Homar; and 3) did not escalate and receive approval from his superiors for the potential conflict of interest associated with the Homar contract. Any of these could have qualified as White's "failure or refusal to comply with Company standards, policies or procedures…." (*Id.*) Because the Court finds the first basis for termination—failing to obtain updated contracts—was sufficient to terminate White for cause, it declines to address Danaher's other two bases for termination, or White's arguments presented for the first time on appeal—that his position was eliminated, and that he was a well-intentioned, but poor performer.

In 2013, after Danaher investigated White's engagement of Homar and Primum, it determined that White had not obtained the proper contracts. (PSUF Nos. 17–19.) A Danaher representative then instructed him to bring the contractors he worked with into compliance. (PSUF No. 20.) But, White did not obtain updated contracts. (PSUF No. 21.)

Even after White received notice of the CWP, he still did not timely obtain contracts with Primum and Homar. As early as June 27, 2014, Danaher emailed White and told him that he needed to submit forms to allow the company to analyze whether Primum and Homar qualified as independent contractors, professional services, or employees. (PLAN 000035.) White acknowledged receipt of this email, and said that he would comply. (*Id.*) Nearly two weeks later, on July 10, 2014, Danaher followed up with White because he had not submitted the requested forms.

(PLAN 000036.) The company also explained that, under the CWP policy, the maximum service for an independent contractor was 18 months, with a 3-month break in service. (*Id.*) "Under no circumstances should [contractors] be performing work without an agreement in place." (*Id.*) White didn't respond to this request until twenty days later, on July 30, 2014, when he said he would "get the forms filled out by tomorrow…" (*Id.*) Another two weeks went by before he submitted the independent contractor form for Homar. (PLAN 000037.) Danaher construed these events as a "failure or refusal to comply with Company standards…." (PLAN 000308.)

White first claims that Danaher did not provide specific reasons for the denial of his benefits, as is required by Section 1133. 29 U.S.C. § 1133 (requiring "specific reasons for such denial, written in a manner calculated to be understood by the participant…."). Danaher cited Section II.B.2 of the Plan, which defines "cause." Danaher then addressed each of White's points, and explained its basis for rejecting his position. (PLAN 000172–76.) With respect to his failure to obtain updated contracts, Danaher explained that it had evaluated the statement of Omar Abdallah, which White submitted in support of his appeal, and determined that it was not credible, taking into account Danaher's investigation and the timeline of events. (PLAN 000173.) Danaher exercised the discretion that it reserved for itself—to make factual determinations as to whether White was terminated for cause—and adequately explained its bases for doing so.

Next, White claims that he had no responsibility to ensure compliance with the CWP because Human Resources, Legal and the BCI Senior Vice President of Human Resources were responsible for administering, establishing, and implementing the CWP. (Opp'n 16 (citing PLAN 000014).) This argument is unavailing because White was asked on several occasions to bring the contractors into compliance, but dragged his feet, despite being informed of the CWP, and agreeing to comply. These facts alone satisfy the Court that Danaher did not abuse its discretion in determining

that White was terminated "for cause." (*See* PLAN 000308 (defining "cause" as including "the employee's willful failure or refusal to satisfactorily perform any duties assigned to the employee….").)

White presented a self-serving statement that he "drafted several versions of the justification for review by Mr. Spicer…, but they never gave any draft a final approval…." (PLAN 000132.) It was within Danaher's discretion to evaluate the credibility of White's statement, which he submitted in conjunction with his appeal for benefits *after* he had been terminated and denied benefits. (PLAN 000315.) Moreover, during the investigation in September 2015, White admitted that the Primum and Homar contracts were not in compliance with the CWP, which contradicts the statement he submitted in support of his appeal. (PLAN 000005.)

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (citing *Bendixen*, 185 F.3d at 944). "[E]ven decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." *Id.* (citing *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1773 (9th Cir. 1993), *abrogated on other grounds by Abatie*, 458 F.3d at 973). On these facts, the Court cannot find that Danaher abused its discretion in terminating White for cause, and subsequently denying him severance benefits. *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (quoting *Conkright v. Frommert*, 559 U.S. 506, 506 (2010)) ("Under the deferential abuse of discretion standard of review, 'the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"). The Court need not address Danaher's other bases for termination because White's failure to satisfactorily perform duties assigned to him is "cause" to terminate him under the Plan. (PLAN 000308.) Accordingly, Danaher did not abuse its discretion in denying White severance benefits.

## V. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Danaher's Motion for Summary Judgment (ECF No. 23), and **VACATES** all remaining dates and deadlines. The Court will issue a judgment consistent with this Order.

June 27, 2018

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**